DOMINION PRODUCTS AND SERVICES, INC., Dominion Retail, Inc., the Manchester Group, LLC and Pamela Post

v.

PITTSBURGH WATER AND SEWER AUTHORITY and Utility Line Security, LLC.

Appeal of: Utility Line Security, LLC.

Dominion Products and Services, Inc., Dominion Retail, Inc., the Manchester Group, LLC and Pamela Post, Appellants

v.

The Pittsburgh Water And Sewer Authority and Utility Line Security, LLC.

Commonwealth Court of Pennsylvania.

Submitted on Briefs Sept. 2, 2011.

Decided Oct. 20, 2011.

Bernard M. Schneider, Pittsburgh, for appellant Utility Line Security, LLC.

Antonio Legaza, Pittsburgh, for appellees Dominion Products and Services, Inc., Dominion Retail, Inc., the Manchester Group, LLC and Pamela Post.

Mark F. Nowak, Pittsburgh, for appellee the Pittsburgh Water and Sewer Authority.

Before: McGINLEY, Judge, and COHN JUBELIRER, Judge, and FRIEDMAN, Senior Judge.

OPINION BY Senior Judge FRIEDMAN.

Utility Line Security, LLC (ULS), appeals from the April 6, 2011, order of the Court of Common Pleas of Allegheny County (trial court), which declared that the Line Warranty Program created by an agreement between ULS and the Pittsburgh Water and Sewer Authority (Authority) violates section 5607(b)(2) of the Municipality Authorities Act (Act).[1] A cross appeal has been filed by Dominion

---

1. 53 Pa.C.S. § 5607(b)(2). Section 5607(b)(2) provides, in pertinent part, as follows:

(2) The purpose and intent of this chapter being to benefit the people of the Commonwealth by, among other things, increasing their commerce, health, safety and prosperity and not to unnecessarily burden or interfere with existing business by the establishment of competitive enterprises; none of the powers granted by this chapter shall be exercised in the construction, financing, improvement, maintenance, extension or operation of any project or projects or providing financing for insurance reserves which in whole or in part shall duplicate or compete with existing enterprises serving substantially the same purposes.

Products and Services, Inc., Dominion Retail, Inc., The Manchester Group, LLC, and Pamela Post (Cross Appellants).

ULS and the Authority entered into an agreement, effective January 1, 2010, whereby ULS would make all necessary repairs to the water and sewer lines of every Authority customer and provide services, valued up to $1 million, to separate sanitary and storm sewer lines. In exchange for these services, the Authority would add a $5.00 fee to the monthly bill of each customer and forward this amount to ULS. The agreement allows any Authority customer to opt out of the program.

Dominion Products and Services, Inc. (Dominion), and The Manchester Group, LLC (Manchester), repair broken water and sewer lines of property owners who choose to participate in their warranty programs, including Authority customers within the City of Pittsburgh. Dominion, Manchester and others filed an action with the trial court, alleging that the Authority's Line Warranty Program violates: (1) the prohibition against negative option billing in section 608.18 of the Pittsburgh Code of Ordinances (Pittsburgh Code); and (2) the prohibition in section 5607(b)(2) of the Act against operating a project that, in whole or in part, duplicates or competes with existing enterprises serving substantially the same purposes.

After considering the matter, the trial court concluded that the Line Warranty Program did not violate section 608.18 of the Pittsburgh Code, but that it did violate section 5607(b)(2) of the Act. ULS filed an appeal with this court, and the Cross Appellants followed with their cross appeal.

On appeal, ULS argues that the trial court erred in concluding that the Line Warranty Program violates section 5607(b)(2) of the Act. The Cross Appel-

lants argue that the trial court erred in concluding that the Line Warranty Program did not violate section 608.18 of the Pittsburgh Code.

In its opinion, the trial court thoroughly and correctly analyzed these issues. Accordingly, we affirm the trial court's April 6, 2011, order and adopt the well-reasoned opinion of Judge R. Stanton Wettick, Jr., entered in *Dominion Products and Services, Inc., Dominion Retail, Inc., The Manchester Group, LLC and Pamela Post v. The Pittsburgh Water and Sewer Authority and Utility Line Security, LLC,* —— D Pa. D. & C. 5th —— (2011) (C.C.P. of Allegheny County, No. GD10–009604, filed March 14, 2011).

### ORDER

AND NOW, this 20th day of October, 2011, the order of the Court of Common Pleas of Allegheny County, dated April 6, 2011, is hereby affirmed on the basis of the opinion issued by Judge R. Stanton Wettick, Jr., in *Dominion Products and Services, Inc., Dominion Retail, Inc., The Manchester Group, LLC and Pamela Post v. The Pittsburgh Water and Sewer Authority and Utility Line Security, LLC,* —— Pa. D. & C. 5th —— (2011) (C.C.P. of Allegheny County, No. GD10–009604, filed March 14, 2011).

### APPENDIX

*OPINION AND ORDER OF COURT*

WETTICK, J.

Pittsburgh Water and Sewer Authority ("PWSA") is an authority created pursuant to the Municipality Authorities Act of 1945, as amended, 53 P.S. § 301 *et seq.*[1] PWSA provides water and sewer services to ap-

---

1. The Municipality Authorities Act is now found at 53 Pa.C.S. § 5601 *et seq.*

proximately 113,000 households within the City of Pittsburgh.

Pursuant to an Amended Agreement, effective January 1, 2010, between United Line Security, LLC ("ULS") and PWSA (Complaint, Ex. 7), ULS agreed to make all necessary repairs to the water and sewer lines of every PWSA customer, and each year to provide services valued at up to $1 million to separate sanitary and storm sewer lines. In exchange for these services, PWSA agreed to add a $5.00 fee to the monthly bill of each PWSA customer and to forward this amount to ULS upon receipt of payment. The Amended Agreement provides that any PWSA customer may opt-out of the program, in which case the $5.00 fee is not collected and ULS is no longer obligated to repair the water and sewer lines of this customer.

Two of the plaintiffs—Dominion Products and Services, Inc. ("Dominion") and The Manchester Group, LLC ("Manchester")—repair broken water and sewer lines of property owners who chose to participate in their warranty programs, including PWSA customers located within the City of Pittsburgh. Dominion and Manchester contend that the Opt–Out Line Warranty Program created through the Amended Agreement is not authorized under the Municipality Authorities Act and violates a City of Pittsburgh Ordinance (Code of Ordinances § 601.18) which prohibits negative option billing. These challenges to the Line Warranty Program are the subject of this Opinion and Order of Court.[2]

■ Under Pennsylvania law, the property owner is responsible for maintaining the water and sewer lines on their properties. If the homeowner fails to maintain the lines, PWSA will arrange for the repairs and place liens on the property for the cost of the repairs.

According to the Briefs of PWSA and ULS, frequently the repairs must be promptly made because of public health considerations. The average cost of a water line repair is between $1,500 and $3,000, and the average cost of a sewer line repair is approximately $4,000 (ULS Sur–Reply Brief, Ex. 6 and Ex. 7).

In many instances, the property owners do not have the resources to make the repairs or to reimburse PWSA for the costs it incurred in arranging for the repairs. Also, the cost of the repairs may exceed the value of the property. Consequently, PWSA is not assured of ever being reimbursed for its expenses when it arranges for the repairs.

The Opt–Out Line Security Program created through the Amended Agreement provides greater protection to the property owner and at less cost as compared to the warranty programs of Dominion and Manchester. This is so because the ability of ULS to serve most of the property owners within a compact geographic area (i.e., the City of Pittsburgh) reduces the costs of operating the warranty program. ULS has this ability to serve most homeowners in Pittsburgh because experience has shown that most people do not opt in to opt-in programs and do not opt out of opt-out programs.

This is borne out by the development of the existing Opt–Out Line Security Program. In early 2009, PWSA determined it was in the interests of both PWSA and its customers for PWSA to provide a cost-effective line warranty program that would protect its customers from being faced with unanticipated and expensive costs of repairing their water and sewer lines-fre-

---

**2.** At the last status conference, it was agreed that I would initially address only the preliminary objections raising these challenges to the Amended Agreement.

quently, in an emergency situation in which the homeowners are not in a position to shop for the best deal. PWSA issued a request for proposals for an opt-in line warranty protection plan. In response to the request, it received two proposals: one from ULS and another from a third-party that has no involvement in this lawsuit.

Upon consideration of the proposals, pursuant to a Board Resolution, on July 31, 2009, PWSA entered into an agreement with ULS that made available to PWSA's customers an opt-in warranty protection plan for their water and sewer lines. The price for providing protection for water and sewer service lines was $8.50 per month with a rebate to PWSA of $14.00 per customer annually. PWSA would bill and collect the monthly payments from its customers who enrolled in the program. Complaint, Ex. 5.

As I previously stated, the goal of the program was to enroll a significant percent of PWSA's customers in the program in order that most customers would have their repairs made by ULS, and PWSA would almost be out of the repair business. The program was a failure. Only approximately 3,000 PWSA customers enrolled in the program.

Through a December 11, 2009 Resolution, the PWSA Board voted to amend the July 31, 2009 Agreement into an opt-out warranty program and to lower the monthly fees based on what would now be an opt-out program. The sixth Whereas clause of the Resolution provided that an opt-out program would benefit PWSA's customers by reducing the cost of warranty services and the seventh Whereas provision stated that the opt-out program would benefit PWSA by promoting the prompt

repair of broken or damaged water service lines and sewer laterals, thereby reducing the incidence of exoneration claims for water lost due to breaks and the incidence of property damage and other claims resulting from subsidence due to broken or damaged sewer laterals. Complaint, Ex. 6.

Pursuant to this Resolution, PWSA and ULS entered into the December 30, 2009 Amended Opt–Out Agreement which reduced the monthly fee to $5.00 (while eliminating the rebate to PWSA) and included a new requirement that ULS would provide up to $1 million annually of services in connection with separating sanitary and storm sewer lines.

In summary, it is reasonable for me at this stage of the proceedings to conclude that (1) customers of PWSA who want warranty protection will receive more protection at less cost through PWSA's opt-out program than will be provided through any sign-up warranty programs of business enterprises in which PWSA has no involvement; (2) a substantial majority of PWSA's customers are, and will continue to be, participants in PWSA's water and sewer line repair protection program, thereby ensuring that for most customers repairs will be promptly completed; and (3) for most customers, PWSA will no longer need to arrange for repairs to water and sewer lines.

### DISCUSSION OF THE LAW

The relief which plaintiffs seek in this lawsuit includes the entry of a court order declaring that the Amended Agreement between PWSA and ULS is invalid and unenforceable and the issuance of an injunction enjoining PWSA from invoicing any of PWSA customers for the line warranty program unless the customer has opted into this program.[3]

3. My rulings in this Opinion shall also apply to the two class actions brought against

 

### A.

██ Plaintiffs contend that the inclusion of a $5.00 fee for the line warranty program on the statement of customers who never opted into this program is the use of negative option billing prohibited by Pittsburgh Code of Ordinances § 601.18. This provision reads as follows:

§ 601.18. PROHIBITED BILLING PRACTICE.

(a) *Definitions.* As used in this section, certain terms are defined as follows:

(1) *NEGATIVE OPTION BILLING.* A business practice whereby a provider of goods or services provides such goods or services without any prior agreement of or a request from the recipient and then bills or otherwise attempts to collect payment from the recipient for such goods or services. *NEGATIVE OPTION BILLING* shall not include isolated instances where a provider mistakenly provides goods or services to a recipient and shall not include any tax or fee charged by a governmental or quasi-governmental entity.

(2) *GOODS.* Any tangible or intangible things or items of value.

(3) *SERVICE.* Any labor, activity or action of value.

(b) *Negative option billing prohibited.* The use of negative option billing by any individual or any business entity, organization or association is prohibited. Any person that receives goods or services as a result of a billing practice that has been judicially determined to be negative option billing has no obligation to pay for or return such goods or services.

Any person who suffers a loss as a result of a negative option billing practice may bring a private action to recover actual and other damages.

(c) *Exceptions.* This section shall not apply to any goods or services provided in an emergency situation or in a situation that the provider of the goods or services reasonably believed to be an emergency.

(d) *Violation and penalty.* Any individual, or any business entity, organization or association violating this section shall be fined up to five hundred dollars ($500.00) for each violation, plus costs. Every day that a negative option billing plan is in effect shall constitute a separate violation.

(Ord.22–1991, eff.6–28–91)

PWSA and ULS apparently agree that ULS cannot charge any individuals or businesses for services without a prior agreement or request from the individual or business. However, both PWSA and ULS contend that ULS is not billing any individual or business. To the contrary, PWSA is charging and collecting a $5.00 fee pursuant to a program created and operated by PWSA under which ULS provides to PWSA services worth up to $1 million each year for separating sanitary and storm sewer lines and under which ULS will make repairs to all broken water and sewer lines of PWSA's customers who have not opted out, thereby relieving PWSA of any responsibility for making the repairs.

I find no merit to plaintiffs' contention that the Opt–Out Line Warranty Program should be characterized as a ULS program under which PWSA serves as a billing agent for ULS. This Program was created

---

PWSA and ULS filed at GD10–002304 (*Steinberg v. PWSA* ) and GD10–002305 (*Farber v. PWSA* ).

and is operated by PWSA to further the separate interests of PWSA, namely, to assure the prompt repair of water and sewer lines of its customers, to drastically reduce the number of situations in which PWSA is left arranging for the repairs, and to obtain services worth up to $1 million each year for separating sanitary and storm sewer lines.

I agree with defendants that the billing practices of a municipal authority are not covered by § 601.18. Under § 601.18(b), only the following may not use negative option billing: "any individual or any business entity, organization or association." These are not categories that are used to refer to governmental entities. Furthermore, it is unlikely that the persons enacting this legislation sought to control the activities of other governmental bodies in an ordinance that did not explicitly refer to governmental bodies.

Also, the reference in § 601.18 is to any "business entity" rather than to any "business or governmental" entity. The use of the term "business" was apparently meant to exclude entities that are not "business" entities.

Finally, the exclusion in § 601.18(a) of "any tax or fee charged by a governmental or quasi-governmental entity" is consistent with my interpretation of § 601.18(b).

### B.

As I previously stated, I agree with PWSA and ULS that the Opt–Out Line Warranty Program is a program created and operated by PWSA. Since PWSA is governed by the Municipality Authorities Act, 53 Pa.C.S. § 5601 *et seq.*, the legality of the PWSA Opt–Out Line Warranty Program is governed by this legislation.

Plaintiffs correctly state that a municipal authority may exercise only those powers granted by its enabling legislation. Section 5607(d) describes the powers that an authority may exercise. I agree with defendants that the creation and operation of the line warranty program constitutes a valid exercise of powers which § 5607(d) has conferred upon an authority. Under § 5607(d)(5), an authority is permitted to "construct, improve, maintain, repair and operate projects" and under § 5607(d)(17) an authority is permitted to "do all acts and things necessary or convenient for the promotion of its business and the general welfare of the authority." See *Glennon's Milk Service, Inc. v. West Chester Area Municipal Authority,* 114 Pa.Cmwlth. 88, 538 A.2d 138, 141 (1988), where the Court, in ruling that the municipal water authority did not abuse its discretion in implementing rules and regulations requiring customers to keep their service pipes on and off their property in good working order at their own expense, stated: "[T]he Authority clearly has the exclusive power to determine services and improvements required to provide adequate, safe and reasonable service."

The Municipality Authorities Act is structured in such a fashion that § 5307(d) provides that every authority may exercise all powers necessary or convenient for the carrying out of the purposes set forth in this section, including the powers specifically described in subsections § 5607(d)(1) through § 5607(d)(31). However, the exercise of these powers is limited by the limitation provisions of § 5607(b). In other words, the power set forth in § 5607(d) cannot be exercised where there is an express provision within § 5607(b) which bars otherwise authorized conduct.

The relevant provisions of § 5607(b) read as follows:

(2) The purpose and intent of this chapter being to benefit the people of the Commonwealth by, among other

things, increasing their commerce, health, safety and prosperity and not to unnecessarily burden or interfere with existing business by the establishment of competitive enterprises; none of the powers granted by this chapter shall be exercised in the construction, financing, improvement, maintenance, extension or operation of any project or projects or providing financing for insurance reserves which in whole or in part shall duplicate or compete with existing enterprises serving substantially the same purposes.

The first provision of § 5607(b) prohibits an authority from unnecessarily burdening or interfering with existing businesses and describes the authority's establishment of a competitive enterprise as an unnecessary burden or interference with an existing business.[4] The second provision does not permit a municipality to exercise powers in the operation of any project which in whole or in part duplicates or competes with existing enterprises serving the same purposes. Both provisions apply.

Prior to the creation of the Opt–Out Line Warranty Program, the water and sewer lines of PWSA customers were repaired by private companies that repair and replace broken water and sewer lines. Under the heading *Plumbing* in the Verizon Yellow Pages for Greater Pittsburgh (March 2009–2010) are listed more than twenty companies describing water and sewer repairs as services that they provide. The Opt–Out Warranty Program comes within the first provision because it is a competitive enterprise created by PWSA that burdens and interferes with existing business. The Opt–Out Line Warranty Program which PWSA has created also comes within the second provision because it competes with existing enterprises and provides substantially the same services.

The Opt–Out Line Warranty Program also competes with the existing warranty programs offered by Dominion and Manchester. In fact, no PWSA customer is likely to continue in (or opt into) plaintiffs' warranty programs because they offer less protection at a higher price.[5]

Assume that PWSA sought to increase rates by $5.00 per month; to earmark these funds for the repair of water and sewer lines; and to create a division of PWSA that repairs water and sewer lines at no cost to its customers. Under § 5607(b)(2), it could not do so because it would be creating an enterprise that competes with the more than two dozen plumbing companies serving the same purpose—the repair of water and sewer lines—and with existing businesses that also offer warranty protection.

I reach the same result if PWSA used the earmarked funds to hire a third party to provide repairs at no cost to the customer. The purpose of such a program is to replace the status quo, in which water and sewer lines are repaired by plumbers chosen by the homeowner, with a repair program in which PWSA selects the entity that will provide the repairs.

4. The only other interpretation that the words would permit is that an authority may establish competitive enterprises that are not very competitive and, therefore, do not have much impact on existing businesses. However, this is not a sensible construction of § 5607(b)(2) because there is no legislative purpose that would be furthered through this construction of the legislation. Furthermore, even under this construction of § 5607(b)(2), the program that the Authority has established completely interferes with competitive enterprises.

5. These companies are still repairing and replacing water and sewer lines outside the City of Pittsburgh.

PWSA and ULS contend that § 5607(b)(2) does not apply because ULS is the competitive enterprise. It was not created by PWSA. I disagree. *Enterprise*—as defined in *Black's Law Dictionary* (9th Ed.2009)—is "an organization or venture." In this case, the venture is a program established and administered by PWSA (1) to ensure that all sewer and water repairs are promptly and competently made for property owners who do not opt-out and (2) to minimize the need for PWSA to arrange for such repairs. This enterprise, established by PWSA, interferes with existing warranty programs and competes with existing plumbing companies that make water and sewer line repairs.[6]

Under 1 Pa.C.S. § 1921(b), when "the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." At the same time, under 1 Pa.C.S. § 1922, the General Assembly does not intend for a statute to be construed to achieve a result which the Legislature could not have intended. In the present case, the words are clear and this legislation achieves a result that the General Assembly could have intended, namely "keeping government small" by permitting government to become involved only where necessary services are not being furnished by private enterprise.[7]

I recognize that it is likely that no business enterprise can provide the benefits to PWSA and to its customers that are provided by the PWSA Opt–Out Line Warranty Program. However, the apparent purpose of the first provision and second provision of § 5607(b)(2) is to protect existing business enterprises from losing business to an enterprise created by a municipal authority. Or, in other words, the apparent purpose is to prevent a municipal authority from competing with existing business enterprises by providing a better service or a better product.

In summary, while the PWSA Opt–Out Line Warranty Program appears to be a good program for PWSA customers, it is not a program that is permitted under the Municipality Authorities Act. For these reasons, I deny defendants' request that I dismiss the case on the ground that the Opt–Out Line Warranty Program is permitted under the Municipality Authorities Act.

### *ORDER OF COURT*

On this 14th day of March, 2011, it is ORDERED that defendants' preliminary objection seeking dismissal of plaintiffs' claims for injunctive and declaratory relief based on Pittsburgh Ordinance § 601.18 is sustained, and defendants' preliminary objection seeking dismissal of plaintiffs' claims for injunctive and declaratory relief based on Section 5607(b) of the Municipality Authorities Act is overruled.

Status conference will be held on March 31, 2011 at 10:00 A.M. o'clock.

---

6. If ULS were seen as independent of PWSA, then as a business it could not use an Opt–Out plan under the Pittsburgh Ordinance prohibiting negative option billing.

7. Section 5607(b)(2)(i)-(vi) lists situations in which its limitations do not apply. See, e.g., (b)(2)(ii) which allows powers to be exercised for industrial development projects if the authority does not develop industrial projects which will compete with existing industries. None permit the Opt–Out Line Warranty Program.